T.C. Memo. 2004-281

UNITED STATES TAX COURT


ORNEAL AND MARTHA KOOYERS, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 20060-02, 20202-02,      Filed December 20, 2004.
             20203-02.


Orneal and Martha Kooyers, pro sese.

Paul L. Dixon, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, Judge: Respondent determined the following income

tax deficiencies and penalties with respect to petitioners'

---

[1]This case is consolidated with OMK Company Trust, docket No. 20202-02, and OMK Family Trust, docket No. 20203-02.

Federal income tax returns for 1998:[2]

| Petitioner | Deficiency | Penalties Accuracy-related Sec. 6662(a) | Fraud[1] Sec. 6663 |
|---|---|---|---|
| Orneal & Martha | $125,772 | -- | $25,154 |
| OMK Company Trust | 50,221 | $10,044 | -- |
| OMK Family Trust | 824 | 165 | -- |

[1]Respondent determined in the alternative that, if Orneal and Martha Kooyers are not liable for the fraud penalty, they are liable for the accuracy-related penalty under sec. 6662(a).

Respondent concedes that Orneal and Martha Kooyers are not liable for the fraud penalty under section 6663. Following that concession we must first decide whether the OMK Company Trust and OMK Family Trust (collectively the OMK trusts) should be disregarded for Federal income tax purposes. We hold that the OMK trusts are to be disregarded. Because the OMK trusts are disregarded for Federal income tax purposes, we must decide five additional issues.

First, we decide whether Orneal and Martha Kooyers (petitioners) are taxable on income from Tamarisk Operations, Ltd., and Fountain Global Trust. We hold that they are not.

Second, we decide whether petitioners are taxable on capital gain of $6,008 as reported by the OMK trusts or $123,391 as

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1998, and Rule references are to the Tax Court Rules of Practice and Procedure. Amounts are rounded to the nearest dollar.

determined by respondent.  We hold that they are taxable on capital gains of $103,791.

Third, we decide whether petitioners may deduct expenses claimed as business expenses by the OMK trusts.  We hold that they may not.

Fourth, we decide whether petitioners are liable for self-employment taxes on compensation paid to the OMK trusts by Pacific Island Ministries (P.I. Ministries).  We hold that they are.

Finally, we decide whether petitioners are liable for the accuracy-related penalty under section 6662(a).  We hold that they are.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the accompanying exhibits are incorporated in these findings by this reference.  When the petitions in these cases were filed, petitioners, who are married, resided in Grass Valley, California, where, at that time, they conducted the activities of the OMK trusts.

A.   Petitioners' Missionary Service in New Guinea

In the spring of 1959, Mr. Kooyers had an epiphany and believed himself called to serve as a missionary.  At the time, petitioners were teaching in northern California.  After obtaining releases from their teaching contracts, petitioners

joined the Wycliffe organization and took linguistic courses for Bible translators and jungle training conducted by Wycliffe. In February 1961, petitioners began performing missionary work in the Sepik River Basin area of Papua, New Guinea. Petitioners settled with their children in the primitive village of Madiwai, where they built a house and studied the village culture and the language of Washkuk. After 2 years, they built a school where Mrs. Kooyers taught.

Petitioners traveled to the United States in 1966, so that Mr. Kooyers could recuperate from hepatitis and they could raise funds for their work in New Guinea. They returned to New Guinea in the fall of 1967 and settled in the town of Ambunti. Mrs. Kooyers began teaching classes there, and eventually the classes evolved into the Ambunti Akademi.

Petitioners completed their translation of the New Testament in 1975. The Wycliffe organization required its missionaries upon completion of a translation to relocate to a new area, study the language, and begin another translation. Petitioners believed that they had been called to serve in the Sepik area of New Guinea. Consequently, they separated from the Wycliffe organization and established P.I. Ministries, through which they continued to conduct their missionary work in New Guinea. Petitioners were employed by P.I. Ministries; Mr. Kooyers served

as chief executive officer, and Mrs. Kooyers served as a teacher and missionary.

Petitioners' daughter Leah graduated from college in 1978 and married Doug Heidema, a son of other missionaries. Leah and Doug settled in Ambunti and assisted petitioners with their missionary activities. Petitioners also sought and trained New Guinea nationals to serve as leaders in the mission activities of P.I. Ministries. Eventually, those nationals conducted a large portion of the mission's activities.

Over the years, the activities of P.I. Ministries greatly contributed to the development of the Sepik area. With funds provided by the U.S. Agency for International Development, P.I. Ministries constructed (i) a large joinery to construct canoes, trusses for buildings, school furniture, and water tanks, (ii) new wards for the Ambunti clinic, and (iii) rain-collection water systems for 165 villages. More recently, P.I. Ministries has supplied villages with medicines and assisted in training orderlies to provide basic medical treatment.

B.    Creation of the OMK Trusts

Petitioners were frugal, made wise investments, and were provided retirement benefits by P.I. Ministries. Consequently, by 1995, they had accumulated substantial savings. Petitioners continued to live a very modest lifestyle, however, even after

they returned to the United States.[3]  They primarily wished to use their savings (i) to ensure that the missionary activities of P.I. Ministries in New Guinea continued and (ii) to provide for the education of their grandchildren.

Petitioners made an extended trip to California in 1995. During that visit, an acquaintance suggested to petitioners that they consider establishing trusts.  Petitioners learned that National Trust Services (NTS) conducted seminars on investments and the use of "complex" trusts.  They paid $9,000 or $10,000 to attend an NTS seminar in 1995.

In November 1995, petitioners created the OMK trusts using forms provided by NTS.  Mr. Kooyers was the grantor/creator of the OMK Family Trust.  As part of the OMK Family Trust's "Complex Trust System", the OMK Family Trust created other trusts, including the OMK Company Trust.  Petitioners were trustees of the OMK trusts and made all decisions concerning the use of trust assets at all times relevant to these cases.[4]  The term of the trusts was 25 years.  As trustees, however, petitioners had

_____

[3]Since petitioners' permanent return to the U.S., they have lived in a mobile home in a mobile home park and have purchased used cars; e.g., in 1998, they sold a 1987 Buick and purchased a used 1993 Buick.

[4]Mrs. Kooyers and National Trust Services (NTS) were named trustees of the OMK Family Trust in the declaration of trust, dated Nov. 16, 1995.  Roy Fritts (Fritts) signed on behalf of NTS.  Mr. Kooyers was named as a trustee on Nov. 17, 1995. Thereafter, neither Fritts nor any other representative of NTS participated in any meetings or decisions of the trustees.

discretion to terminate any trust before the end of the 25-year period and, at the end of the period, could renew the trust agreement for another period up to 25 years.

Petitioners intended that 20 percent of the beneficial interest in the OMK Family Trust was to be held by their children and 80 percent was to be held by P.I. Ministries. Minutes of the board of trustees of OMK Family Trust, dated November 17, 1995, indicate that there were 100 beneficial units, of which 80 were held by the OMK Charitable Trust[5] and 20 were held by petitioners' children. Minutes of the board of trustees of the OMK Company Trust, dated November 18, 1995, indicate that the OMK Family Trust was the sole beneficiary of the OMK Company Trust.

Minutes of the board of trustees of the OMK Family Trust, dated November 17, 1995, state that the beneficial certificates convey no interest of any kind in the trust assets; convey no voice in the management or control of the trust but do convey a right to receive a pro rata share of "emoluments" that may be distributed by the trustees.

---

[5]The minutes of the board of trustees of the OMK Family Trust, dated Nov. 17, 1995, state that the trustees agreed to create a private charitable foundation (a charitable trust) to which units of beneficial interest were issued. The declaration of trust for the OMK Charitable Trust is not in the record.

Mrs. Kooyers transferred to Mr. Kooyers all of her interest in all her real and personal property.[6] Mr. Kooyers then transferred all of petitioners' property, real and personal, to the OMK Family Trust. The declaration of trust of the OMK Family Trust states that the trustees were authorized to accept rights, title, and interest in real and personal property conveyed by Mr. Kooyers to be the corpus of the trust, including "the exclusive use of his lifetime services and ALL of his EARNED REMUNERATION ACCRUING THEREFROM".

For 1998, the OMK Company Trust entered into separate agreements with P.I. Ministries, pursuant to which the trust agreed to provide the services of petitioners as independent contractors to P.I. Ministries and P.I. Ministries agreed to pay the trust for services provided by petitioners. Mr. Kooyers was to serve as assistant to P.I. Ministries' chief executive officer, and Mrs. Kooyers was to serve as a missionary. In 1998, P.I. Ministries paid the OMK Company Trust $106,788 for petitioners' services.

In 1998, the OMK Company Trust paid all expenses petitioners thought were related to their mission work, including the costs of their housing, medical care, travel, and family gatherings.

---

[6]The property Mrs. Kooyers conveyed to Mr. Kooyers included exclusive use of her lifetime services "exception being that of an employee situation".

The OMK Company Trust also paid the education expenses of petitioners' grandchildren.

C.    Investments in Ponzi Schemes

Minutes of the OMK Company Trust trustees meeting, dated May 29, 1996, state that the trust contracted with William Joe Little (Little) of NTS to act as "Agent Trustee" to handle investments. Little was also affiliated with Fountainhead Global Trust (Fountainhead).  During the course of his relationship with petitioners, Little exploited their strong religious motivations and convinced them that he was a "keen Christian".

In February 1997, petitioners traveled to Grand Cayman Island to attend meetings conducted by Little, Fritts, and Lewis Rowe (Rowe) of Zephyr International Ltd. (Zephyr).  The meetings were to explain the NTS/Zephyr relationship and to promote investing through an offshore entity.  Little, Fritts, and Rowe convinced petitioners that the proposed investments were sound, that Little, Fritts, and Rowe were highly qualified and licensed professionals, and that the "operation is completely legal, honest, upright and is run by men of highest integrity.  Only these kind of men are so licensed under the authority of the Caymanian government which operates under British law."

As advised by Fritts, Little, and Rowe, petitioners contracted with Zephyr to form Tamarisk Operations Ltd. (Tamarisk), through which the OMK trusts invested $550,000.

Tamarisk invested $250,000 in a loan program called "Cash for Titles" and $300,000 in an investment called Lanstar.  Minutes of OMK Company Trust, dated August 18, 1998, indicate that the Loan Account (previously Cash for Titles) in which $250,000 had been invested was "now valued at the August 15 date at $454.6K".  A Tamarisk statement, dated November 19, 1998, sent to the OMK trusts by Zephyr, reported that the balance in the loan program was $333,460 on December 31, 1997, and $472,785 on September 30, 1998.  The $139,325 increase was attributable to monthly transactions recorded as interest.

The OMK trusts also invested with Little in Fountainhead. Fountainhead quarterly statements for March 31, June 30, September 30, and December 31, 1998, reported the following transactions:

|  | Mar. 31 | June 30 | Sept. 30 | Dec. 31 |
|---|---|---|---|---|
| Last quarter's balance | -0- | -0- | $100,000 | $100,000 |
| New investment | $100,000 | $100,000 | -0- | -0- |
| Total interest this quarter | -0- | 4,160 | 12,661 | 12,661 |
| Less return of principal | -0- | -0- | 7,714 | 7,714 |
| Less return of interest | -0- | -0- | 4,001 | 4,001 |
| Less management fees | -0- | 304 | 946 | 946 |
| Total investment value | 100,000 | 103,856 | 100,000 | 100,000 |

The "investments" promoted by Little, Fritts, and Rowe were in reality scams, and petitioners never recovered their money. The "cash for title" loan program investment was in reality a large-scale, international Ponzi scheme devised by Michael Gause (Gause).  Gause conducted the scheme in the Cayman Islands

through a network of corporations and bank accounts that he controlled.[7] Gause and others, including Rowe, represented to the investors that the proceeds from the sales of securities would provide high-interest consumer loans. Contrary to those representations, most of the proceeds were used to pay interest and principal to earlier investors, as well as commissions and fees to the promoters. Rather than making a profit on the investments, petitioners lost most of the money they invested.

D.   Petitioners' and the OMK Trusts' 1998 Returns

Larry Dickson (Dickson) of Isler & Co. in Medford, Oregon, prepared the 1998 income tax returns for petitioners and the OMK trusts. Someone associated with NTS had recommended Dickson as an accountant knowledgeable in taxation of complex trusts, as well as a "church member". Dickson prepared petitioners' 1998 Form 1040, U.S. Individual Income Tax Return, as well as separate 1998 Forms 1041, U.S. Income Tax Return for Estates and Trusts, for the OMK Family Trust and the OMK Company Trust.

On their return, petitioners reported total income of $5,245, including $245 of dividends and $5,000 of trustee fees

_____

[7]Gause pleaded guilty to conspiracy, securities fraud, and international money laundering in connection with the Ponzi scheme. United States v. Gause, Criminal Action No. 99 Cr. 1100 (S.D.N.Y., Oct. 24, 1999). The Government of the Cayman Islands charged Rowe and Patrick Tibbetts with money laundering in connection with Gause's "Cash 4 Titles" scheme. See In re United States, No. 04-MC-9 (N.D.W.Va. Apr. 15, 2004)(order granting motion for writ of habeas corpus ad testificandum).

($2,500 each, which they each reported as subject to self-employment taxes of $353). They also reported nontaxable Social Security benefits of $29,534.

On its return, the OMK Company Trust reported total income of $129,311, which included $29,481 of interest from Fountainhead, $2,089 of dividends, $91,732 of other income, and $6,008 of capital gain. The other income was described as $106,788 from P.I. Ministries less $15,056 "return of capital Fountainhead Global". The capital gain reported on the return included $1,930 of capital gain from the sale of shares of three Scudder funds--Scudder Latin American Fund (Latin), Scudder Greater Europe Growth Fund (Growth), and Scudder Investment Trust (Investment)--and $4,078 from other investments, reported as follows:

| Fund | Sale Price | Basis | Gain (Loss) |
|---|---|---|---|
| Scudder funds | | | |
| Latin | $47,755 | $45,301 | $2,454 |
| Growth | 32,719 | 33,243 | (524) |
| Investment | 64,239 | 64,239 | -0- |
| Other funds | | | |
| L.A. small cap | 27,387 | 28,194 | (807) |
| L.A. small cap | 28,597 | 30,012 | (1,415) |
| J. Hancock | 16,052 | 16,142 | (90) |
| Pilgrim | 15,333 | 16,137 | (804) |
| L.A. class A | 32,186 | 24,992 | 7,194 |
| Total | $264,268 | $258,260 | $6,008 |

The OMK Company Trust claimed total deductions of $129,899, including $3,729 for fiduciary fees, $56,871 for charitable

contributions, $900 for attorney, accountant, and return preparer fees, and $68,399 for other deductions. The other deductions included $15,970 for continuing education, $6,037 for travel expenses, $448 for dues and subscriptions, $2,461 for medical, $2,224 for investment expenses, $6,457 for publishing costs, $6,724 for rentals, $760 for repairs and maintenance, $12,041 for supplies, $1,845 for 50 percent of the cost of meals, $4,043 for other trust expenses, and $9,389 for a net operating loss.

On its return, the OMK Family Trust reported an adjusted total loss of $944 ($61 of interest income less net operating loss of $1,005). The OMK Family Trust also reported (but did not deduct on the basis of the passive activity loss limitations) a net loss of $5,712 from rental real estate activity, which included $3,318 unallowed losses from prior years. The $2,394 loss from 1998 rental real estate activity reported on Schedule E, Supplemental Income and Loss, derived from rental income of $3,671 and deductions of $120 for repairs, $279 for taxes, $1,991 for utilities, and $3,675 for depreciation.

Respondent examined petitioners' 1998 return, as well as the returns filed by the OMK trusts, and issued notices of deficiency to petitioners and the OMK trusts.

In the notice of deficiency issued to the OMK Family Trust, respondent disallowed the claimed rental expenses and increased the trust's income by the $3,671 rent reported as received on the

return.  Respondent also disallowed the $1,005 net operating loss and imposed the accuracy-related penalty under section 6662(a).

In the notice of deficiency issued to the OMK Company Trust, respondent disallowed all items deducted on the trust's 1998 return, increasing the trust's taxable income by $129,899.

In the notice of deficiency issued to petitioners, respondent determined that the OMK trusts should be disregarded for Federal income tax purposes and consequently made the following adjustments to petitioners' income:

| Item | Adjustment |
|------|-----------|
| Taxable Social Security | $25,104 |
| Capital gain | 123,791 |
| Self-employment tax | (7,191) |
| Itemized deductions | (10,127) |
| Standard deduction | 8,800 |
| Exemptions | 5,400 |
| Service income Mr. Kooyers | 55,974 |
| Fiduciary fees Mr. Kooyers | (2,500) |
| Service income Mrs. Kooyers | 50,814 |
| Fiduciary fees Mrs. Kooyers | (2,500) |
| Dividend income | 2,089 |
| Interest income | 168,868 |

Respondent determined that the income from P.I. Ministries was subject to self-employment tax of $15,089.  Respondent also determined that petitioners were liable for the civil fraud penalty under section 6663 or, alternatively, for an accuracy-related penalty under section 6662(a) and (b)(1) for negligence or disregard of rules or regulations.

OPINION

As a general rule, the Commissioner's determinations in a notice of deficiency are presumed correct, and the burden is on the taxpayer to prove otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). The general rule does not apply, however, under circumstances where section 7491 places the burden of proof or production on the Commissioner.[8]

The Commissioner bears the burden of proof with respect to a factual issue relevant to ascertaining a taxpayer's liability for income tax, if the taxpayer introduces credible evidence with respect to that factual issue. Sec. 7491(a)(1). The preceding rule applies, however, only if the taxpayer has (i) complied with requirements under the Code to substantiate any item, (ii) maintained all records required by the Code, and (iii) cooperated with reasonable requests by the Secretary for information, documents, and meetings. Sec. 7491(a)(2). The taxpayer bears the burden of proving that these requirements have been met. Snyder v. Commissioner, T.C. Memo. 2001-255 (citing H. Conf. Rept. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995).

---

[8]Sec. 7491 applies to court proceedings arising in connection with examinations beginning after July 22, 1998. Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(a), 112 Stat. 726. The year at issue is 1998, and the examination began after July 22, 1998. Thus, sec. 7491 applies to this case.

In this case, there are multiple factual issues relevant to determining petitioners' tax liability. Petitioners have not addressed or provided any evidence concerning $61 of interest income or substantiated expenses claimed by the OMK trusts. Consequently, section 7491(a)(2) does not place on respondent the burden of proving those factual issues. The resolution of the remaining issues does not depend on which party has the burden of proof. We resolve those issues on the preponderance of the evidence in the record.

## I. Income of the OMK Trusts Is Taxable to Petitioners

Respondent determined that the OMK trusts should be disregarded for Federal income tax purposes and the income reported by the trusts taxed to petitioners.

Courts have consistently invalidated similar trusts for Federal income tax purposes. Those courts that have been faced with the issue have been uniform in their determinations that those entities will not allow a taxpayer to shift the incidence of taxation away from himself to the trust. We cite only a few of the many cases so holding. See, e.g., Zmuda v. Commissioner, 731 F.2d 1417 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Holman v. United States, 728 F.2d 462 (10th Cir. 1984); O'Donnell v. Commissioner, 726 F.2d 679 (11th Cir. 1984); Hanson v. Commissioner, 696 F.2d 1232 (9th Cir. 1983), affg. T.C. Memo. 1981-675; Schulz v. Commissioner, 686 F.2d 490 (7th Cir. 1982),

affg. T.C. Memo. 1980-568; Vnuk v. Commissioner, 621 F.2d 1318 (8th Cir. 1980), affg. T.C. Memo. 1979-164; Wesenberg v. Commissioner, 69 T.C. 1005 (1978). These cases involved facts strikingly similar to the facts here.

In the cited cases, family trusts were set up using forms, materials, and step-by-step instructions bought from promoters of trust schemes. Generally the wife conveyed her real and personal property to the husband. The husband then conveyed all family property, including the family residence and vehicles, to the trust, along with the right to receive income derived from his lifetime services. In return, the husband received the entire beneficial interest in the trust evidenced by beneficial interest certificates.

Initially, the wife and a third party (usually the promoter) were designated as trustees.[9] Within a day or two, however, the husbands also were named as trustees. The husband and wife then became sole trustees, with the trusts to bear all their trust-related expenses.

Shares of the beneficial interest were then divided between the husband and wife and/or other family members. Any disbursement of trust income would be made pro rata in accordance with the beneficial interests as evidenced by the certificates,

---

[9]See Markosian v. Commissioner, 73 T.C. 1235, 1244 n.7 (1980), where a trustee who served only 1 month without performing any duties was disregarded as a mere nominee.

and, if the trust was terminated, the assets were also to be distributed according to the beneficial interest certificates.

The trustees were empowered to pay compensation to officers, employees, and agents of the trusts, including themselves. The term of each trust usually was 25 years unless the trustees unanimously decided on an earlier termination date. As trustees, the taxpayers retained almost unlimited discretionary powers to deal with the trust assets, distribute income, and terminate the trust. The husbands and wives continued to use and enjoy the property that had been conveyed and/or leased to their trusts.

Generally, the courts have disregarded these trusts for Federal income tax purposes. There are four grounds courts have used to disregard a trust. First, the trust was created as a guise for deducting personal consumption expenses. Second, the income of the trust is taxable to the taxpayer under the assignment of income doctrine. Third, the trust is a grantor trust under the provisions of sections 671 through 677. Fourth, the trust lacks substance. See, e.g., Zmuda v. Commissioner, supra; Holman v. United States, supra; O'Donnell v. Commissioner, supra; Hanson v. Commissioner, supra; Schulz v. Commissioner, supra; Vnuk v. Commissioner, supra; Wesenberg v. Commissioner,

supra.  The reasoning of those courts is equally applicable here.

A.  Attempted Deduction of Personal Consumption Expenses

After attending the NTS seminars, petitioners thought that once they had conveyed their personal assets, like cars and residences, to the OMK trusts, the trusts could deduct personal consumption expenses such as fire insurance, utilities, and repair and maintenance--indeed, almost everything except the costs of food consumed at home.  "It is fundamental to our income tax regime that personal consumption expenditures--food, clothing, travel, education, entertainment--do not generate income tax deductions unless they are somehow inextricably linked to the production of income."  Schulz v. Commissioner, supra at 492-493.  Personal expenses do not become deductible expenses of trust administration merely because title to property is placed in the trust.  Id.  There must be a nexus between the expense and the business conducted by the trust to qualify for a tax deduction.  Conversely, legitimate expenses of a taxpayer's business are deductible regardless of whether the taxpayer is an individual or a trust.  United States v. Buttorff, 761 F.2d 1056, 1060 (5th Cir. 1985).

The OMK trusts did not engage in any trade or business.  Thus, the claimed deductions are not deductible under section 162.  Transferring property into the trusts did not aid in the production of income, nor did it alter management activity.

Petitioners simply restructured the form in which they held their property.  Rearranging title is not related to management or conservation under section 212.  Zmuda v. Commissioner, 731 F.2d at 1422.  Moreover, section 212 was not designed to allow tax deductions based on mere preservation of net worth.  Id.  Thus, respondent could, and did, properly disallow the expenses the trusts claimed.

B.  Assignment of Income

The assignment of income doctrine provides a second and broader-based attack on family trusts of the type described here. Schulz v. Commissioner, 686 F.2d at 493.  Petitioners provided services to P.I. Ministries.  P.I. Ministries paid the OMK Company Trust for those services, and the trust reported that income on its Form 1041.  It is established law that income is taxed to the person who earns it.  Commissioner v. Culbertson, 337 U.S. 733, 739-40 (1949).  Attempting to avoid taxation by diverting income from the true earner to another entity does not, in and of itself, shift the incidence of taxation.  United States v. Basye, 410 U.S. 441 (1973); Lucas v. Earl, 281 U.S. 111 (1930).  The determination of the proper taxpayer depends upon which person or entity in fact controls the earning of the income rather than who ultimately receives the income.  Vnuk v. Commissioner, 621 F.2d at 1320; Vercio v. Commissioner, 73 T.C. 1246 (1980).

Where the taxpayer simply assigns his or her lifetime services and income earned from the performance of those services, and the taxpayer rather than the trust has the ultimate direction and control over the earning of the compensation, the conveyance is ineffective to shift the tax burden from the taxpayer to the trust.  Vnuk v. Commissioner, supra at 1320; Wesenberg v. Commissioner, 69 T.C. at 1010-1011; see also Holman v. United States, 728 F.2d at 464; O'Donnell v. Commissioner, 726 F.2d at 681; Hanson v. Commissioner, 696 F.2d at 1234.

Like the taxpayers in the cited cases, petitioners were not bona fide servants of the OMK Company Trust because the trust had no right to supervise their employment or determine the resulting income or benefit.  The purported conveyance of petitioners' lifetime services to the trust did not create a legal obligation because petitioners were on both sides of the transaction, as employees and as trustees, leaving no one to enforce the obligation.  See Schulz v. Commissioner, supra at 494.

Similarly, the contracts for services entered into by the OMK Company Trust and P.I. Ministries concern the services of the individual having control over P.I. Ministries as its chief executive officer and over the trust as trustee.  Neither the OMK Company Trust nor P.I. Ministries could be said to have had control of petitioners' activities.  See Stoecklin v.

Commissioner, T.C. Memo. 1987-453, affd. 865 F.2d 1221 (11th Cir. 1989).

The "ultimate direction and control" rested in petitioners, not in the OMK Company Trust.  Indeed, it would be unrealistic to assume that anyone would transfer his or her lifetime services to a family trust without having such control.  Borchert v. Commissioner, T.C. Memo. 1982-379.  Moreover, such a purported conveyance of lifetime services would be unenforceable and essentially nugatory under applicable State law in at least the vast majority of instances.  United States v. Buttorff, supra at 1061.

Petitioners were the sole source of the OMK Company Trust's earned income and should be taxed on the income they generated from their services.  Cf. Vercio v. Commissioner, supra at 1254. In such circumstances, the conveyance was merely an anticipatory assignment of income and was insufficient to shift the incidence of taxation from petitioners to the OMK trusts.  We therefore hold that the income earned by petitioners through their services should be taxed to them.

C.  Grantor Trusts

Petitioners transferred more than their earning abilities to the OMK trusts.  They also transferred all of their personal and income producing property to the trusts.  Different rules apply to gifts of income-producing property to trusts.  Courts have

found income from property held in trusts similar to the OMK trusts taxable to the grantors of those trusts under the "grantor trust" provisions set out in sections 671 through 677. See, e.g., Zmuda v. Commissioner, supra at 1421; Holman v. United States, supra at 464-65; Hanson v. Commissioner, supra at 1234; Vnuk v. Commissioner, supra at 1321. Under specified circumstances, the grantor trust provisions treat the grantor of the trust as the substantial owner of all or part of the trust, and all of the income and deductions pertaining to that part of the trust must be taken into account by the grantor. Sec. 671. The grantor trust is not taxed on the income that is taxable to the grantor. Id.

For purposes of the grantor trust provisions, a grantor includes any person to the extent that person either creates a trust or gratuitously transfers property, directly or indirectly, to a trust. Sec. 1.671-2(e)(1), Income Tax Regs. If one person creates or funds a trust on behalf of another person, both persons are treated as grantors of the trust. Id. Courts have examined trust arrangements, similar to those at issue here, where the wife generally conveys all her property to the husband who then conveys to the trust all his property, including the property transferred from his wife. Although the wife was not a

grantor technically, the courts refused to accept this distinction.  Rather, the courts have treated the wife as a grantor because the adversity between parties is artificial and will not shield the trust from the operation of the grantor trust provisions.  United States v. Buttorff, 563 F. Supp. 450, 454 (N.D. Tex. 1983), affd. 761 F.2d 1056 (5th Cir. 1985).  The wife's "conveyance can be ignored, either on the familiar tax principle that substance predominates over form, or because the parties themselves treated it as neither a sale nor a gift."  Schulz v. Commissioner, 686 F.2d at 496 (fn. ref. omitted).  These trusts violate the grantor trust statutes in substance, if not in form.  Id. at 495; accord Zmuda v. Commissioner, 731 F.2d at 1421; Holman v. United States, supra at 464-65.  Thus, Mrs. Kooyers, as well as Mr. Kooyers, is a grantor of the OMK Family Trust.  Because petitioners are grantors of the OMK Family Trust, they are also grantors of the OMK Company Trust and any other trust for which the OMK trusts are grantors.  See sec. 1.671-2(e)(5), Income Tax Regs.

The grantor of the trust will be taxed on the income of the trust under the grantor trust provisions if any of certain conditions apply.  First, he possesses a disqualifying reversionary interest.  Sec. 673.  Second, the trust can be revoked by the grantor or a nonadverse party.  Sec. 676.  Third, trust income can be distributed to the grantor or the grantor's spouse or be used to pay for insurance on their lives without the consent of an adverse party.  Sec. 677.  Fourth, specified powers

to control beneficial enjoyment of the corpus or income are vested in the grantor or certain other persons. Sec. 674. Fifth, certain administrative powers are exercisable by the grantor or a nonadverse party. Sec. 675.

Adverse party is defined as "any person having a substantial beneficial interest in the trust which would be adversely affected by the exercise or nonexercise of the power which he possesses respecting the trust." Sec. 672(a). Even if the section 672 definition of an adverse party is satisfied, however, sections 674-677 require a trust's income to be taxed to the grantor unless the consent of the adverse party is required before the grantor may exercise any of the powers enumerated in those sections. Because petitioners did not hold beneficial interests in the trusts, they were not adverse parties with respect to each other. See, e.g., Schulz v. Commissioner, supra at 495-496.

In 1998, the OMK Company Trust paid petitioners' costs of housing, medical care, travel, and family gatherings. The OMK Company Trust also paid the education expenses of petitioners' grandchildren, who were not beneficiaries of the OMK trusts. Several factors indicate that petitioners retained total control over the OMK trusts and that the trusts are grantor trusts. First, none of petitioners' powers as trustees required the consent of an adverse party. Second, petitioners retained

enjoyment of the trust corpus and income.  Third, petitioners used the OMK trusts for their own benefit.  We hold that the income of the OMK trusts is taxable to petitioners under the grantor trust provisions of sections 671-677.

D.    Trusts Lack Substance

Finally, courts have frequently found that trusts substantially identical to the OMK trusts are lacking in any real substance and thus are without any effect for Federal tax purposes.  See, e.g., Zmuda v. Commissioner, supra at 1421; Muhich v. Commissioner, T.C. Memo. 1999-192, affd. 238 F.3d 860 (7th Cir. 2001); Dahlstrom v. Commissioner, T.C. Memo. 1991-264, affd. without published opinion 999 F.2d 1579 (5th Cir. 1993); Clawson v. Commissioner, T.C. Memo. 1982-321.

Taxpayers have a legal right to structure their transactions to minimize their tax obligations by whatever means allowable under the law.  Gregory v. Helvering, 293 U.S. 465, 469 (1935).  Transactions that have no significant purpose other than to avoid tax and do not reflect economic reality, however, will not be recognized for Federal income tax purposes.  Zmuda v. Commissioner, 79 T.C. 714, 719 (1982), affd. 731 F.2d 1417 (9th Cir. 1984).  If a transaction has not altered any cognizable economic relationships, we must look beyond the form of the transaction and apply the tax law according to the transaction's substance.  Markosian v. Commissioner, 73 T.C. 1235, 1241 (1980).

This principle applies regardless of whether the transaction creates an entity with separate existence under State law. Zmuda v. Commissioner, 79 T.C. at 720.

Petitioners argue that they did not create the OMK trust to avoid taxes. We find the testimony of Mr. Kooyers was sincere and credible. He testified that he and Mrs. Kooyers established the trusts to provide for the continued funding of the missionary activities of P.I. Ministries and for the education of their grandchildren. Although we are convinced that petitioners intended to support the missionary activities of P.I. Ministries,[10] the record does not establish that any beneficial interest passed to P.I. Ministries. The named beneficiaries of the OMK trusts are petitioners' children and the OMK Charitable Trust. Documents related to the OMK Charitable Trust are not in the record, however, and the beneficiaries of the OMK Charitable Trust are not identified in the record.

Courts will disregard a transaction when the transaction has no economic effects other than the creation of tax benefits.

_____

[10]The Department of Justice (DOJ) began a campaign to stop the spread of phony trust schemes that the Government contends are being used illegally to evade the payment of taxes. In a lawsuit the DOJ filed, the Government obtained a permanent injunction against Roderick Prescott, a former promoter of NTS, barring him from selling trust schemes that falsely claimed an individual's personal expenses could be paid through a trust to obtain tax benefits not available to the individual. United States v. Prescott, Civil No. 02-CV-0692-L (S.D. Cal., June 2, 2003).

Knetsch v. United States, 364 U.S. 361, 365-366 (1960). Furthermore, even if a transaction has economic effects, it must be disregarded if it has no business purpose and its motive is tax avoidance. Gregory v. Helvering, supra at 469; Neely v. United States, 775 F.2d 1092, 1094 (9th Cir. 1985).

In deciding whether a purported trust lacks economic substance, we consider the following factors: (1) Whether the taxpayer's relationship, as grantor, to property purportedly transferred into trust differed materially before and after the trust's formation; (2) whether the trust had a bona fide independent trustee; (3) whether an economic interest in the trust passed to trust beneficiaries other than the grantor; and (4) whether the taxpayer honored restrictions imposed by the trust or by the law of trusts. Markosian v. Commissioner, supra at 1243-1245; Castro v. Commissioner, T.C. Memo. 2001-115; Hanson v. Commissioner, T.C. Memo. 1981-675, affd. per curiam 696 F.2d 1232 (9th Cir. 1983).

The first factor we consider in deciding whether a trust has economic substance is whether a taxpayer's relationship, as grantor, to the property transferred into trust differed materially before and after the trust's formation. Markosian v. Commissioner, supra at 1243.

The record makes clear that petitioners' relationship, as grantors, to their property before they created the OMK trusts

did not differ materially from their relationship to the property after they created the trusts and transferred the property to the trusts. The OMK trusts did not engage in any trade or business, and petitioners, as trustees, had complete control over the income-producing property of the trusts.

The second factor we consider is whether the trust had a bona fide independent trustee. Markosian v. Commissioner, supra at 1243-1244. Although NTS was named as an initial trustee of the OMK Family Trust, Fritts of NTS simply signed the formation documents. In contrast, petitioners exercised complete control over the OMK trusts' assets and made all decisions regarding the trusts. We find that no independent trustee had any meaningful role in operating the OMK trusts. In addition, the record does not indicate that a genuine economic interest in the trusts passed to anyone other than petitioners. As to the fourth factor whether petitioners honored restrictions imposed by the trusts or by the law of trusts, we note that petitioners were not bound by any restrictions imposed by the trust instruments or the law of trusts as to the use of transferred property. See Norton v. Commissioner, T.C. Memo. 2002-137. Petitioners' transferring the titles of assets to the OMK trusts while retaining the use and enjoyment of the assets are transactions that have no economic effect other than to create income tax benefits. Consequently, the OMK trusts will not be recognized for tax purposes.

II.  Petitioners Did Not Receive Income From Tamarisk and
     Fountainhead

Respondent determined that petitioners failed to include

$168,868 of interest in their 1998 income.  The notice of

deficiency issued to petitioners does not identify the sources of

the interest.  The explanation of items states that interest

income reported on Form 1099-INT was not reported on petitioners'

return.  The explanation also states that interest on bank

deposits, coupons payable on bonds, loans, etc., is taxed to a

cash basis taxpayer when credited or due.  On brief, respondent

asserts that $29,481 of interest from Fountainhead reported by

the OMK Company Trust and $139,326 shown as interest on the

November 19, 1998, Tamarisk statement but not reported on any

return should be included in petitioners' income.[11]  Respondent

contends that those amounts represent "accessions to wealth,

clearly realized, and over which the taxpayers have complete

dominion".  We disagree.

Not only were petitioners misled by the principals and

agents of NTS with respect to the legal effect and benefits of

establishing the OMK trusts; they were defrauded by Little,

Fritts, and Rouse with respect to the investments in Fountainhead

and the Tamarisk loan program, a.k.a, "cash for titles".  The

_____

[11]The record is silent with respect to the remaining $61 of
interest reported on the return of the OMK Family Trust that
respondent determined in the notice of deficiency is taxable to
petitioners.

"investments" promoted by Little, Fritts, and Rowe were in reality scams, and petitioners never recovered their money. The "cash for title" loan program investment was in reality a large-scale, international Ponzi scheme.

Little, Fritts, and Rowe represented to petitioners that the investment would provide high-interest consumer loans. Contrary to those representations, most of the proceeds were used to pay interest and principal to earlier investors, as well as commissions and fees to the promoters. Petitioners did not make a profit on the investments. Rather, they lost most of the money they invested.

The weight of authority holds that certain distributions to taxpayers in Ponzi or pyramid schemes (where proceeds of later investors are used to pay distributions to early investors, lending an appearance of legitimacy to a fraudulent "investment") are current income. Parrish v. Commissioner, T.C. Memo. 1997-474, affd. 168 F.3d 1098 (8th Cir. 1999); Premji v. Commissioner, T.C. Memo. 1996-304, affd. without published opinion 139 F.3d 912 (10th Cir. 1998); Wright v. Commissioner, T.C. Memo. 1989-557, affd. without published opinion 931 F.2d 61 (9th Cir. 1991); Murphy v. Commissioner, T.C. Memo. 1980-218, affd. per curiam 661 F.2d 299 (4th Cir. 1981); Harris v. United States, 431 F. Supp. 1173 (E.D. Va. 1977). In all but one of the above cases, however, the taxpayers were early investors who had

recovered their initial "investments" during the same taxable year as the Ponzi distributions. In the exceptional case, Parrish, the taxpayer, an officer and director of the scheme's corporate vehicle, did not introduce evidence to show either the amounts he invested or received, nor did he prove he was a victim of fraud.

In two other cases, the taxpayers had not recovered their initial investments during the same tax year as the Ponzi distributions. Greenberg v. Commissioner, T.C. Memo. 1996-281; Taylor v. United States, 81 AFTR 2d 98-1683, 98-1 USTC par. 50,354 (E.D. Tenn. 1998). In those cases, the courts held that the distributions were a return of investment funds, not income.

In Greenberg, the taxpayers transferred funds to a Ponzi scheme that purported to be a legitimate mortgage company. The taxpayers were passive investors and were paid monthly payments from the company's bank account. They presented sufficient evidence to establish that the amount they received did not exceed the amount they paid. This Court found that the payments the taxpayers received were not interest because the payments were not compensation for the use or forbearance of money. See Deputy v. duPont, 308 U.S. 488, 498 (1940) (interest is compensation for the use or forbearance of money). Instead, we found that the payments constituted nontaxable return of capital

made to conceal the fraudulent misappropriation of the taxpayers' investment.

In Taylor, the taxpayers' law partner was operating a Ponzi scheme, providing cash to investors, including the partnership and its clients, with other clients' money, rather than providing true returns on real investments. The taxpayers, the other partners in the partnership, filed returns for the tax year in which they had reported their shares of the partnership "phantom profit" from the scheme. Afterwards they filed amended returns eliminating that income and claiming refunds of tax. The taxpayers established that the partnership received less from the scheme that year than it delivered to the partner in that year and that the partner made no investments on behalf of the partnership. The court held that, for those reasons, the taxpayers were entitled to the refunds.

We conclude that the "interest" label given to the payments petitioners received in 1998 through their investments with Little and Rowe was patently erroneous. These payments were not for the use and forbearance of their money but, rather, were made to conceal the fraudulent misappropriation by Little and Rowe of the money petitioners entrusted to them.[12] Accordingly, the

_____

[12]We note that this Court has held that losses from investments that turn out to be Ponzi schemes give rise to a theft loss deduction in the taxable year in which the taxpayer discovers the loss. Sec. 165(c)(3), (e); Jensen v. Commissioner,
(continued...)

payments represented a return of petitioners' investment and are not includable income as interest simply because the payments were reported as interest on statements of the investment accounts. Cf. Burnet v. Logan, 283 U.S. 404 (1931).

Petitioners have not addressed or provided any information regarding the remaining $61 of interest reported on the return of the OMK Family Trust that respondent determined in the notice of deficiency was taxable to petitioners. Respondent's determination in the notice of deficiency is presumptively correct, and petitioners have the burden of proving that no part of the amounts received constituted interest or was otherwise not taxable to them. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Section 7491(a)(1) does not shift the burden of proof to respondent. Consequently, $61 of interest determined in the notice of deficiency is to be included in petitioners' income.

III. Petitioners Had Additional Capital Gain of $103,791 From the Sale of Mutual Fund Shares

Respondent also determined that petitioners had $123,791 of unreported capital gain. The explanation in the notice of deficiency issued to petitioners stated that petitioners' capital gain was increased because the OMK trusts are disregarded for

_____

[12](...continued)
T.C. Memo. 1993-393, affd. without published opinion 72 F.3d 135 (9th Cir. 1995); see also Premji v. Commissioner, T.C. Memo. 1996-304, affd. 139 F.3d 912 (10th Cir. 1998).

income tax purposes. The explanation further stated that the bases are valued at the original purchase prices and the step-up in bases given the assets at the time of transfer is not allowed.

On brief, respondent clarifies that the basis in each of the Scudder funds is $15,000 rather than the amounts reported on the OMK Company Trust return. Consequently, respondent contends that the correct amount of the capital gain includable in petitioners' income is $103,791, computed as follows:

| Fund | Sale Price | Basis | Gain (Loss) |
|------|------|------|------|
| Scudder funds | | | |
| Latin | $47,755 | $15,000 | $32,755 |
| Growth | 32,719 | 15,000 | 17,719 |
| Investment | 64,239 | 15,000 | 49,239 |
| Other funds | | | |
| L.A. small cap | 27,387 | 28,194 | (807) |
| L.A. small cap | 28,597 | 30,012 | (1,415) |
| J. Hancock | 16,052 | 16,142 | (90) |
| Pilgrim | 15,333 | 16,137 | (804) |
| L.A. class A | 32,186 | 24,992 | 7,194 |
| Total | $264,268 | $160,477 | $103,791 |

Petitioners do not challenge respondent's revised computation of the capital gain. We hold, therefore, that petitioners' income should include $103,791 of capital gain.

IV. Petitioners Failed To Substantiate Expenses Claimed as Business Expenses of the OMK Trusts

Because the OMK trusts are disregarded, petitioners may be entitled to deduct expenses claimed by the trusts provided the

expenses are substantiated and would otherwise be deductible by petitioners.  Respondent allowed petitioners total itemized deductions of $10,127 computed as follows:

| Expense | Amount |
|---|---|
| Medical expense | |
|   Total medical expenses | $1,916 |
|   Less 7.5% AGI | (31,451) |
|     Medical expense deduction | -0- |
| Taxes | 558 |
| Home interest expense | 3,712 |
| Contributions | 14,702 |
| Misc. expenses | |
|   Total misc. expenses | 3,559 |
|   Less 2% AGI | (8,387) |
|     Excess misc. expense deduction | -0- |
| Total | 18,972 |
| Less applicable limitation[1] | (8,845) |
|   Total itemized deductions | 10,127 |

[1]Computed on adjusted gross income of $419,340.

The OMK Company Trust claimed total deductions of $129,899, including $3,729 for fiduciary fees, $56,871 for charitable contributions, $900 for attorney's, accountant's, and return preparer's fees, $15,970 for continuing education, $6,037 for travel expenses, $448 for dues and subscriptions, $2,461 for medical, $2,224 for investment expenses, $6,457 for publishing costs, $6,724 for rentals, $760 for repairs and maintenance, $12,041 for supplies, $1,845 for 50 percent of the cost of meals, $4,043 for other trust expenses, and $9,389 for a net operating loss.  The OMK Family trust claimed deductions of $120 for

repairs, $279 for taxes, $1,991 for utilities, and $3,675 for depreciation related to rental real estate.

Although some of those expenses might represent otherwise deductible expenses, petitioners have not substantiated the amount or purpose of any of the items claimed by the OMK trusts on the trusts' Forms 1041. Consequently, we conclude that petitioners are entitled to deduct only those items allowed in the notice of deficiency. The total of itemized deductions allowed is computational, dependent on the adjustments to income, and will be determined in the Rule 155 computation.

V.    Petitioners Are Liable for Self-Employment Taxes on Compensation Paid to the OMK Trusts by P.I. Ministries

Respondent determined that amounts paid to the trust for petitioners' services are subject to self-employment tax. Section 1401(a) imposes the tax upon "the self-employment income of every individual". The term "self-employment income" is defined as "net earnings from self employment". Sec. 1402(b). Such earnings include "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle". Sec. 1402(a). We find that Mr. Kooyers was engaged in a trade or business as assistant to the chief executive officer and Mrs. Kooyers was engaged as a missionary and that the income they derived pursuant to the contract for services between the OMK Company Trust and P.I. Ministries is subject to self-employment tax.

Our decision is supported by the agreements entered into between P.I. Ministries and the OMK Company Trust. Those agreements stated that the OMK Company Trust contracted petitioners' services to P.I. Ministries on an independent contractor basis. Consequently, because no employment relationship was created, P.I. Ministries did not withhold or pay any employment taxes on the compensation paid for petitioners' services. Having been given the opportunity to choose the form of the contract, petitioners have less freedom than respondent to ignore the transactional form that they have adopted. See Coleman v. Commissioner, 87 T.C. 178, 202 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987); Bolger v. Commissioner, 59 T.C. 760, 767 n.4 (1973). Petitioners were independent contractors, and as such they are subject to self-employment tax. See Simpson v. Commissioner, 64 T.C. 974, 983 (1975). We sustain respondent's determination on this issue.

VI. Petitioners Are Liable for the Accuracy-Related Penalty Under Section 6662(a)

Section 6662(a) and (b)(1) imposes a penalty equal to 20 percent of the portion of an underpayment of income tax attributable to negligence or disregard of rules or regulations. Negligence is defined as "any failure to make a reasonable attempt to comply with the provisions of * * * [the Code]". Sec. 6662(c). Negligence is the lack of due care or the failure to do what a reasonable and prudent person would do under the

circumstances. <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985). The term "disregard" includes "any careless, reckless, or intentional disregard." Sec. 6662(c). Disregard of rules or regulations is careless if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation.

Respondent has the burden of production under section 7491(c), but petitioners have the burden of proof. See <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446-447 (2001). Respondent must come forward with sufficient evidence that it is appropriate to impose the penalty. See <u>id.</u>

After attending the NTS seminars on investments and the use of "complex" trusts, petitioners believed NTS's representations that once they had conveyed their personal assets, including lifetime services, to the OMK trusts, they could assign their income from P.I. Ministries to the OMK trusts and deduct personal expenses. They also believed Little's promises of extraordinary returns on their investments. Unfortunately, petitioners never sought independent legal or tax advice before or after creating the OMK trusts pursuant to the trust scheme NTS promoted. A competent independent tax adviser would have warned petitioners that the scheme would not survive scrutiny by the Internal Revenue Service or the courts. This trust scheme was without economic substance, was an anticipatory assignment of income, and

was in violation of the grantor trust provisions.  See Zmuda v. Commissioner, 731 F.2d 1417 (9th Cir. 1984); Holman v. United States, 728 F.2d 462 (10th Cir. 1984); O'Donnell v. Commissioner, 726 F.2d 679 (11th Cir. 1984); Hanson v. Commissioner, 696 F.2d 1232 (9th Cir. 1983); Schulz v. Commissioner, 686 F.2d 490 (7th Cir. 1982); Vnuk v. Commissioner, 621 F.2d 1318 (8th Cir. 1980); Wesenberg v. Commissioner, 69 T.C. 1005 (1978).

A taxpayer's adoption of a flagrant tax avoidance scheme that has repeatedly been rejected by the courts is patently negligent.  Wesenberg v. Commissioner, supra at 1015; see also Hanson v. Commissioner, T.C. Memo. 1981-675.  Respondent has produced ample evidence to demonstrate that the OMK trusts lacked economic substance and served no real purpose other than tax avoidance.  Additionally, petitioners created the OMK trust after this Court and other courts had considered several cases involving similar abusive trusts and determined that the trusts would not be respected for Federal income tax purposes.  See, e.g., Zmuda v. Commissioner, 79 T.C. 714 (1982); Markosian v. Commissioner, 73 T.C. 1235 (1980); Schneider v. Commissioner, T.C. Memo. 1987-560; Hanson v. Commissioner, supra.  Consequently, we conclude that respondent provided sufficient evidence that petitioners' understatement of tax was due to negligence or disregard of rules and regulations and has met the

burden of production. Petitioners have the burden of proving that the accuracy-related penalty does not apply.

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment, however, if a taxpayer shows that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, that portion. Sec. 6664(c)(1); sec. 1.6664-4(b), Income Tax Regs. Generally, the responsibility to file accurate returns and pay tax when due rests upon the taxpayer and cannot be delegated; the taxpayer may have to bear the consequences of any negligent errors committed by his or her agent. Pritchett v. Commissioner, 63 T.C. 149, 173-175 (1974); Am. Props., Inc. v. Commissioner, 28 T.C. 1100, 1116-1117 (1957), affd. 262 F.2d 150 (9th Cir. 1958).

The determination of whether the taxpayers acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess his or her proper tax liability, the knowledge and experience of the taxpayers, and the reliance on the advice of the professional. Sec. 1.6664-4(b)(1), Income Tax Regs. Reasonable cause has been found when a taxpayer selects a competent tax adviser, supplies the adviser with all relevant information, and, consistent with ordinary business care and prudence, relies on the adviser's professional judgment as to the taxpayer's tax obligations. Sec. 6664(c); United States v. Boyle, 469 U.S. 241, 250-251 (1985);

Estate of Young v. Commissioner, 110 T.C. 297, 317 (1998); Am. Props., Inc. v. Commissioner, supra; secs. 1.6662-3(a), 1.6664-4(a), Income Tax Regs. In order to so qualify, a taxpayer must prove by a preponderance of the evidence that (i) the adviser was a competent professional who had sufficient expertise to justify the taxpayer's reliance on him, (ii) the taxpayer provided necessary and accurate information to the adviser, and (iii) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002); Sklar, Greenstein & Scheer, P.C. v. Commissioner, 113 T.C. 135, 144-145 (1999).

Petitioners hired Dickson because NTS recommended him for his knowledge of complex trusts. Petitioners introduced no evidence regarding Dickson's credentials or his knowledge and experience in preparing tax returns or analyzing trust arrangements for Federal income tax purposes. Dickson was not called as a witness in the trial of these cases. In short, petitioners failed to prove that Dickson was a competent tax adviser and that petitioners were justified in relying on him. See Ewing v. Commissioner, 91 T.C. 396, 423, (1988), affd. without published opinion sub nom. Toll v. Commissioner, 940 F.2d 1536 (9th Cir. 1991); Bowen v. Commissioner, T.C. Memo. 2001-47; sec. 1.6664-4(b), Income Tax Regs.

Because petitioners failed to prove they reasonably relied on a fully informed and competent tax adviser and because they did not assert any other basis for relief from the section 6662(a) penalty, we hold that petitioners have failed to prove that they had reasonable cause within the meaning of section 6664(c). We, therefore, sustain respondent's determination that petitioners are liable for the accuracy-related penalty under section 6662(a).

Because the OMK trusts are disregarded for Federal income tax purposes, there are no deficiencies in their Federal income taxes. To reflect the foregoing,

<u>Decision will be entered under Rule 155 in docket No. 20060-02.</u>

<u>Decisions will be entered for petitioners in docket Nos. 20202-02 and 20203-02.</u>